UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIIE HARRIS | : | PRISONER |
| | : | NO. 3:02CV1580 (JBA)(JGM) |
| VS. | : | |
| | : | |
| LIEUTENANT R. MEULEMANS, ET AL. | : | MAY 3, 2005 |

**THE DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS**

The undersigned counsel, on behalf of the defendants, moves to dismiss the plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. More specifically, the plaintiff has failed to state a claim for which relief may be granted for the following reasons:

1. The plaintiff has no liberty interest in any classification decision based on a finding that he is a member of a gang.

2. The plaintiff did not lose any good time as a result of the tickets in question and, as a result, such tickets did not implicate a liberty interest.

**I.   FACTS**

The plaintiff is an inmate confined to the custody of the Connecticut Department of Correction ("DOC"). He brings this 42 U.S.C. § 1983 lawsuit against four current or former employees of the DOC. He alleges that, while incarcerated at the Cheshire Correctional Institution, he was stabbed by another DOC inmate on July 2, 1999. He further alleges that after this incident the DOC placed him in administrative segregation without a notice, allegedly in violation of DOC Directives.

The plaintiff claims that the DOC gave him a disciplinary ticket on July 3, 1999 for fighting in spite of his contention that he was the victim. He does not allege that he was found guilty on the ticket. He claims that as a result of this ticket he was transferred to another facility while remaining on segregation status.

On July 22, 1999, the DOC issues a disciplinary report accusing the plaintiff of being a Security Risk Group Safety Threat Member. On August 12, 1999, defendant Lt. Meulemans held a hearing and found that the plaintiff was a Security Risk Group Threat Member. Specifically, he found that the plaintiff was a member of the Elm City Boys. This decision was upheld by the DOC.

The plaintiff did not lose any good time as a result of these classification and disciplinary decisions. This is confirmed by the copies of the decisions which the plaintiff has attached to his complaint and the DOC's disciplinary history sheet, which the undersigned has attached to this memorandum.

## II.     STANDARD OF REVIEW

In ruling on a Federal Rule of Civil Procedure 12(b) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 235 (1974). Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. See Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).

**III.    DISCUSSION**

    **A.    The Plaintiff Did Not Lose Any Good Time On These Tickets**

The plaintiff first alleges that the DOC deprived him of his due process rights by holding hearings without affording him the opportunity to defend himself. However, based on the tickets which the plaintiff attaches to his complaint, it is evident that he did not lose any good time. No case at any judicial level in Connecticut has ever held that a disciplinary ticket not resulting in loss of good time credits implicates a liberty interest under the United States Constitution. In fact, the courts have held the converse, i.e., that a ticket may only be challenged if the ticket caused the inmate to lose previously earned good time credits. See, e.g., Abed v. Armstrong, 43 Conn. App. 176, 181-82 (1996). Sanctions of the type received by plaintiff – punitive segregation, confinement to quarters, and loss of visitation – do not affect any protected liberty interest. See Santiago v. Commissioner, 39 Conn. App. 674, 680 (1995). To the extent that the petitioner has lost the ability to _earn_ good time as the result of his placement in punitive segregation, that is merely a classification issue which is within the discretion of the Commissioner of Correction and does not state a liberty interest. See Abed, supra, id.

    **B.    The Plaintiff Has No Liberty Interest In Any Classification**

The plaintiff next asserts that his classification as a Security Risk Group Safety Threat Member is incorrect and that he was not afforded appropriate due process in the decision to so classify him. There is no liberty interest in inmate classification, and therefore the plaintiff's

claim fails as a matter of law.  The United States Supreme Court made clear in 1976 in <u>Moody v. Daggett</u>, 429 U.S. 78 (1976) that:

> [N]o due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate.  The same is true of prisoner classification and eligibility for rehabilitative programs. . . . and petitioner has no legitimate or statutory or constitutional entitlement sufficient to invoke due process.

429 U.S. at 88, n. 9.  The Connecticut Supreme Court has likewise stated unambiguously and admitting no exception:  "Prison classification and eligibility for various rehabilitation programs, wherein prison officials have full discretion to control those conditions of confinement, do not create a statutory or constitutional entitlement sufficient to invoke due process."  <u>Wheway v. Warden</u>, 215 Conn. 418, 431 (1990) (emphasis added), <u>citing</u> <u>Moody</u>, <u>supra</u>, and <u>Meachum v. Fano</u>, 427 U.S. 215 (1976).

This precedent was recently reaffirmed by the United States Supreme Court in the context of sex offender treatment.  In <u>McKune v. Lile</u>, 536 U.S. 24 (2002), the Court upheld the validity of Kansas' sex offender treatment program against a challenge that the program violated an inmate's Fifth Amendment right against self-incrimination.  As part of the Kansas sex offender treatment program, participating inmates were required to complete a sexual history form detailing all prior sexual activity including uncharged criminal offenses.  <u>Id</u>. at 30.  The form was not confidential, and release of information on the form and subsequent prosecution for the uncharged offenses was a possibility.  <u>Id</u>.  If the inmate refused to participate, his classification level was changed, and he was subject to the following:

> [His] visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to personal television, and other privileges automatically would be curtailed. In addition, [the inmate] would be transferred to a maximum-security unit, where his movement would be more limited, he would be moved from a two-person to a four-person cell, and he would be in a potentially more dangerous environment.

Id. at 30-31.

In rejecting the inmate's Fifth Amendment challenge, the Supreme Court stated that not only did the circumstances described above fail to comprise a Fifth Amendment claim but that they failed to even constitute a liberty interest sufficient to invoke due process. Id. at 37-42. In so ruling, the Supreme Court, as the ultimate authority on constitutional issues, noted that its own decision in Sandin v. Conner, 15 U.S. 472 (1995), dictates the standard to be applied in determining when a liberty interest sufficient to invoke due process exists in a deprivation alleged with regard to challenged prison conditions. Id. at 37 "[T]he Court held in Sandin that challenged prison conditions cannot give rise to a due process violation unless those conditions constitute 'atypical and significant hardships on inmates in relation to the ordinary incidents of prison life.'" Id., quoting Sandin v. Conner, 515 U.S. 472, 484 (1995).

Applying the Sandin analysis for when and if a liberty interest exists to the question of Fifth Amendment compulsion, the Supreme Court stated in McKune that, "The Sandin framework provides a reasonable means of assessing whether the response of prison administrators to correctional and rehabilitative necessities are so out of the ordinary that one could sensibly say they rise to the level of unconstitutional compulsion." Id. at 41. In finding

5

that the change in classification in <u>McKune</u> did not constitute a liberty interest under its decision in <u>Sandin</u>, the Supreme Court reasoned as follows:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. . . . To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life. . . . It is well settled that the decision where to house inmates is at the core of prison administrators' expertise. The Court has considered the proposition that a prisoner in a more comfortable facility might begin to feel entitled to remain there throughout his term of incarceration. The Court has concluded, nevertheless, that this expectation "is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all. . . .
>
> Respondent also complains that he will be demoted from Level III status to Level I status as a result of his decision not to participate. This demotion means the loss of his personal television, less access to prison organizations and the gym area; a reduction in certain pay opportunities and canteen privileges, and restricted visitation rights. . . . The Constitution accords prison officials wide latitude to bestow or revoke these prerequisites as they see fit. Accordingly, <u>Hewitt v. Helms,</u> 459 U.S. 460, 467 (1983) held that inmate's transfer to another facility did not in itself implicate a liberty interest, even though that transfer resulted in the loss of "access to vocational, educational, recreational and rehabilitative programs."

<u>Id</u>. at 39-40. Clearly, there is no liberty interest in classification decisions which impact an inmate's access to certain correctional facilities or to certain programming. Classification as a Security Risk Group Safety Threat Member is not alleged by the plaintiff, nor could it be, to impose living conditions that constitute an atypical or significant hardship beyond the ordinary incidents of prison life, and thus the essential tenet that there is no liberty interest sufficient to invoke due process in a classification decision holds true here as well.

Indeed, the analysis the Supreme Court mandates in a number of decisions, not the least of which is Sandin, supra, is whether harm suffered by the inmate in the alleged deprivation of due process resulted in a "relevant actual injury" cognizable by the court. See Lewis v. Casey, 518 U.S. 343, 351 (1996) (discussing relevant injury rule). Indeed, the ruling of Sandin was that, even were the process leading up to a correctional decision faulty, unless the ultimate decision or impact on the inmate exceeded the expected circumstances in "an unexpected manner", there is no cognizable liberty interest. Sandin, supra, 515 U.S. at 484 (distinguishing itself from Vitek v. Jones, in which placement in a mental institution was considered "unexpected"). Sandin reiterated that the Due Process Clause itself does not create a liberty interest in being free from 'every change in the conditions of confinement having a substantial adverse impact on the prisoner" or from transfers from cell to cell within a prison, so long as conditions remain "within the normal limits or range of custody which the conviction has authorized the State to impose." 515 U. S. at 478.

Sandin makes clear that it is not for the courts to delve into the decision-making process that leads to an acceptable, constitutional result. Indeed, far more adverse circumstances than Security Risk Group Member status are held to invoke no liberty interest, and thus no procedural due process protections. Administrative segregation is considered to fall within the "normal range of custody." Sher v. Coughlin, 739 F.2d 77, 80-81 (2d Cir. 1984). It is also settled that inter-prison transfers fall within that range, Meachum v. Fano, 427 U.S. at 224-25, as do inter-state transfers. Olim v. Wakinekona, 461 U.S. 238 (1983).

7

## IV. CONCLUSION

For the reasons set forth above, the defendants respectfully urge that their motion to dismiss be granted.

        DEFENDANTS,
        Lt. R. Meulemans, et al.

        RICHARD BLUMENTHAL
        ATTORNEY GENERAL

BY: /s/_____
        Neil Parille
        Assistant Attorney General
        Federal Bar No. 15278
        110 Sherman Street
        Hartford, CT 06105
        Telephone No.: (860) 808-5450
        Fax No. (860) 808-5591
        E-mail: neil.parille@po.state.ct.us

## CERTIFICATION

I hereby certify that a copy of the foregoing was sent by first-class mail, postage prepaid, this 3rd day of May 2005 to:

Willie Harris, Inmate No. 162841
Osborn Correctional Institution
335 Bilton Road, PO 100
Somers, CT 06071

        /s/_____
        Neil Parille
        Assistant Attorney General